

## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **GORDON ROY PARKER,** <br><br> Plaintiff <br><br><br> v. <br><br><br> **GOOGLE, INC.,** and John Does #1-50,000, <br><br> Defendants | **CASE NO.:** 04-cv-3918 <br><br> **Judge: James McGirr Kelly** |

### PLAINTIFF'S FIRST AMENDED COMPLAINT

**Plaintiff** in the above-styled action submits this Amended Complaint, and in support

thereof, sets forth and avers the following.

**FILED**

### THE PARTIES

OCT 22 2004

1.    Plaintiff **Gordon Roy Parker** ("Plaintiff") is an adult male resident of the United

MICHAEL E. KUNZ, Clerk

States, who resides and is domiciled at 4247 Locust Street, #806, Philadelphia, PA 19104.

~~Dep. Clerk~~

Plaintiff does business in the state of Pennsylvania as internet publisher **Snodgrass Publishing**

**Group**, a sole proprietorship registered in Pennsylvania and licensed to do business in

Philadelphia, headquartered at 4247 Locust Street, #806, Philadelphia, PA 19104.

2.    Defendant Google, Inc. ("Google") is a Delaware Corporation headquartered in

California, who can be served through its registered agent, Corporation Service Company

2711 Centerville Road, Suite 400 Wilmington, DE 19808.  It does business primarily through its

website, which is located at http://www.google.com.

3.    The "50,000" John Does represent Google's partners through its "AdSense" and

"AdWords" programs, whereby Google "sells" the results of certain words (or phrases) that

internet users enter into its search engine.

## NATURE OF COMPLAINT AND STATEMENT OF JURISDICTION

4.    This is a complaint for copyright infringement, defamation (including libel, false-light invasion of privacy, and trade libel), tortious interference, invasion of privacy, negligence, abuse of process, Lanham Act, civil conspiracy, and racketeering.

5.    Jurisdiction is proper in this venue because of:

     a.    The copyright infringement claim (18 USC §107 *et seq.*)

     b.    The Lanham Act claims (42 USC §1125 *et seq.*);

     c.    The RICO claims (18 USC §1964(c));

     d.    The existence of multiple federal questions (28 USC §1331).

     e.    Google doing business in Philadelphia subjects itself to jurisdiction in the Eastern District of Pennsylvania; and

     f.    The alleged copyright infringement involved the pirating of material which was published by Plaintiff on his website, www.cybersheet.com, which was hosted during the time in controversy in Bucks County, Pennsylvania through NuNet, Inc.

The Plaintiff in this action filed the original complaint on August 18, 2004, which was then served on Defendant, who moved to dismiss this action on September 8, 2004. This Amended Complaint addresses issues raised in Defendant's Motion To Dismiss, as well as conduct which has accrued since the filing of the original complaint.

The nature of Defendant's Motion To Dismiss is such that it has severely changed the complexion of this lawsuit. Given a choice between arguing simple noninvolvement and immunity as a third-party content provider, Defendant instead has chosen to launch a vicious personal attack against Plaintiff, using cynical and irrelevant "water cooler" arguments in an attempt to short-circuit the judicial process by having this case dismissed before Plaintiff ever

gets a chance to be heard.  By doing so, however, Defendant has placed itself at the vanguard of the very RICO enterprise it seeks to distance itself from.

Defendant did not have to "get personal" in this lawsuit, as it has, since most of the underlying facts are not in dispute, and since the legal issues raised in this action apply to anyone similarly situated to Plaintiff.  Many of these issues are of the first-impression variety and their resolution would be as or more beneficial to Defendant as to Plaintiff, as Defendant's envelope-pushing business model is such that it is literally a "lawsuit waiting to happen."  Indeed, legal experts the globe over have taken both sides of these issues, speaking of the day in court they will receive as inevitable, rather than the result of a loose-cannon, vexatious litigant that Defendant would like to have this court perceive this action as.

## BACKGROUND

### Averments Related To Google's Business Model

6.    Google, like Plaintiff, is an internet publisher with a website that has mostly free content.  It proudly bills itself as the world's premier internet search engine.   Barely a half-decade after its inception, it has even managed to become a verb: i.e., "to Google" a person means to search their name on the internet in general, and at Google in particular.  Google's search engine has so transformed our society that the first thing many individuals do upon meeting someone new is "Google" their name.[1]

7.    Google is an unquestionable financial success.  Its stock price at the close of trading on Thursday, October 18, 2004 was $149.16 per share, well above its IPO price, giving it a market capitalization of $40,455,175,200.[2]  Indeed, on the eve of this filing, its share price jumped again to $161.70, with another glowing article in today's *NY Times* in which CEO Eric

---

[1] Indeed, on the "Regis And Kelly" television show on or about April 17, 2004, Amy Porter described the process of "Googling" someone, and referred to it as a way of getting "information" about that person.

3

Schmidt stated that the "demand that exists for the kind of advertising we do is really quite large and to a large degree unmet," while the article quoted a financial analyst as saying that "We can't adequately answer the question of whether the company's stock is overvalued until we can tell what the company is."

8.    In or around 2000, Google™ acquired the USENET archive database[3] from AltaVista corporation, and has continued through the present to maintain and publish its archive, while also allowing users to search it (i.e., to "Google™" it).  The archive consists of every message posted to USENET since its inception in 1981.  Google's own website states that:

> "Google has fully integrated the past 20 years of Usenet archives into Google Groups, which now offers access to more than 845 million messages dating back to 1981. We believe this to be the most complete collection of Usenet articles ever assembled and a fascinating *first-hand historical account.* (Emphasis Added).[4]

9.    Google's website allows users to search the USENET archive in a multitude of ways, including author, date, keywords or phrases, subject, specific newsgroup, or even for a specific message by its unique identifier ("message ID"), or any combination thereof.  Following is a computer screenshot of  Google's "Advanced Groups Search" page[5] as it existed on October 19, 2004 at 3:00 a.m. EST:

---

[2] Source: http://www.nytimes.com/2004/10/18/technology/18search.html?th (NY Times Article: "Google Envy Is Fomenting Search Wars.").  The full text of this article is attached hereto as Exhibit A and incorporated by reference as if fully set forth verbatim herein.
[3] USENET is a system of decentralized internet message boards which are owned by no one.  A collective "bathroom wall" as it were.
[4] Source: http://www.google.com/googlegroups/help.html#archive.
[5] Source: http://www.google.com/advanced_group_search?hl=en

10.   Google's website also allows users who have accounts with Google to post USENET messages through "Google Groups," its web-based news server.  Google markets its Groups service and USENET archive in tandem, as follows:

> Google Groups contains the entire archive of Usenet discussion groups dating back to 1981. These discussions cover the full range of human discourse and provide a fascinating look at evolving viewpoints, debate and advice on every subject from politics to technology. Google's search feature enables users to access this wealth of information with the speed and efficiency of a Google web search, providing relevant results from *a database containing more than 845 million posts.*[6]

11.   Google allows the author of a posting to remove ("nuke") a posting from the archive. However, it does not allow third parties to have postings removed, except in what it calls "extreme circumstances" as follows:

> By its very nature, Usenet consists of information posted by many people. Google does not monitor or control the content of this information. Instead, we simply provide access to the public forum in which people post their comments.
>
> Accordingly, *if you are concerned about a message that someone has posted, you need to resolve that problem directly with the person who posted it.* Except in extreme circumstances, Google will not act upon an individual's request to remove another person's messages. *We firmly believe it is not Google's role to resolve disputes* among

---

[6] Source: http://www.google.com/googlegroups/help.html#archive

the users who have posted millions of messages on Usenet, nor would it be possible to fulfill that role if we chose to undertake it.[7]

12.   In addition to its USENET archive, Google archives much of the internet, which it presents to users in two ways: as search results, or as a full, copied ("cached") version of the website.  Google will not publish its cached version of a site if the site publisher specifically makes that request, although it will use its copy of a site to return the site in a list of search results.  The web search engine allows for searches by word, phrase, date of site update, or even from a specific domain name, as follows:



13.   Google makes money from its search tools through its AdWords™ program, where advertisements which are relevant to the search terms get priority placement among the results in a "sponsored links" section.  According to the NY Times Article (Exhibit A):

> it took Google 18 months to figure out a way to turn its free Web search engine into a profit-making enterprise by selling ads linked to search terms. *That business generated about $690 million for Google in the last quarter.* Yahoo, Google's closest rival in search, reported last week that it had $765 million in advertising revenue for the quarter. (Emphasis Added).

---

[7] Source: http://www.google.com/googlegroups/help.html#9

14.   The AdWords™ program is profitable because internet users who are "ready to buy" often turn to search engines to "shop" online.  For example, a Google user in search of advice on seduction might type in the phrase "how to get women" to find free or premium websites which contain that exact phrase (if entered into the search engine in quotation mark).  Following is an actual screenshot of a search for the term "how to get women" made on Google's web archive on October 19, 2004 at 12:36 p.m. EST:



15.   The "sponsored links" for this search include several products which could be considered direct competitors of Plaintiff's (such as seduction-technologies.com).  With the AdWords program, Sponsors "bid" on placement for each search term, and pay that amount every time a user clicks the sponsored link.

16.   On October 19, 2004 at 12:46 p.m. EST, Plaintiff typed the word "seduction" into Google's web search engine and specified those results from his own website (by using the "site:cybersheet.com" specifier).  The returned search results contained AdWords advertisements for Plaintiff's competitors, as follows).

7



17.   To make it possible for users to search Google's web archive as they are capable of, Google must first have an entire copy of each indexed website in order to be able to scan for the words.  It returns verbatim excerpts from each site in the index that meet the search criteria.

18.   The AdWords program allows individuals and businesses to profit from Google even if they do not publish a website on their own.  Through the use of this program, and a website's "affiliate program" (where the site pays a commission on sales which result from tracked referral clicks), a user can join an affiliate program and use AdWords to have their affiliate links (cloaked) turn up as "sponsored links" on Google.  When those AdWords links are clicked, the affiliate will get a commission for any resulting sales.

19.   Since search results are generated by full copies of the websites contained in the Google index, those who purchase search terms through AdWords are using nothing other than the contents of the Google index (and Google's arrangement of these contents in the form of search results) to draw traffic to their sponsored links.  The affiliate, who contributes no content on his or her own to the internet, uses the content of its competitors to siphon traffic from the very sites those users are trying to find!  Google is "lifting" massive amounts of content from the

8

web, with or without permission to do so, and using that content to enrich itself and its AdWords customers, at the expense of that content's creators.

20.   The Google AdWords program allows for the "cloaking" of affiliate links, so that the end user is never made aware that they are clicking an affiliate link.  The link can even be cloaked to make it appear as if it were the product website itself being linked to.  For example, a DoubleYourDating affiliate can list their link simply as "doubleyourdating.com" without the "affiliate tag" (e.g., "doubleyourdating.com/refid=622") that would tip off the end user that it was an affiliate link.



21.   The starling (pictured above) is a bird whose "business model" is similar to Google's in that a starling *"may lay its eggs in another starling's nest and often takes over other songbirds' nests to lay their own eggs."*[8]  Google lays its "eggs" (advertisements) in a "nest" (its search results) that are created with the intellectual property of other "birds" (internet users). The starling benefits from not having to build its own nest, while Google profits from not having to develop its own web content.  Just as *TV Guide* does not produce television shows, and just as the telephone company does not offer the services it advertises, Google does not generally create web content other than what is derived from its source data, but instead profits from that source data without paying its creators any royalty.  Unlike *TV Guide* or the telephone directory, however, Google actually appropriates content from those in its listings, and profits from that

---

[8] Source: http://www.royalbcmuseum.bc.ca/programs/songbirds/starling.html

appropriation.  In this light, Google's smashing financial success (an aberration in the internet world) should come as no surprise.

22.   Google has made "safe harbor" statements pursuant to SEC regulations that have included references to the "infringing aspects" of its business and the potential consequences of those "aspects" on its future viability.  To wit:

> ***With respect to any intellectual property rights claim, we may have to pay damages or stop using technology found to be in violation of a third party's rights.*** We may have to seek a license for the technology, which may not be available on reasonable terms and may significantly increase our operating expenses. The technology also may not be available for license to us at all. As a result, we may also be required to develop alternative non-infringing technology, which could require significant effort and expense. ***If we cannot license or develop technology for the infringing aspects of our business, we may be forced to limit our product and service offerings and may be unable to compete effectively.*** Any of these results could harm our brand and operating results.[9] (Emphasis Added)

23.   When Plaintiff formed his internet company in 1998, he had intended to build a human-edited internet portal called ***Linkway***.[10] Plaintiff envisioned Linkway as a tool for accomplishing what Google now accomplishes by providing targeted search results, with the main difference that there would be no actual content from the linked-to sites included, and with revenue derived either from advertising placed over the directory, affiliate links contained within the directory, by charging a nominal flat fee for listings, or a combination thereof.  Google, however, has completely sucked the value out of the Linkway model because it is far more efficient to unilaterally copy the entire internet for indexing.

24.   Even if Google were to prevail on the copyright issues raised herein, Plaintiff could still compete against them very easily because he would have a "green light" from the courts to do exactly what Google is doing now.  The only reason Plaintiff has not developed his portal is the legal uncertainty surrounding any attempt to compete on Google's terms.

---

[9] Source: http://www.cafezine.com/news_template.asp?deptid=8&Id=648 (quoting Google's S-1 filing).
[10] Plaintiff had published a prototype for Linkway at http://www.cybersheet.com/linkway.html.

25.   Looking ahead, Google stands poised to use the profits from the past few years (plus investment capital) to develop the "noninfringing aspects" of its business: these include its AdSense program, which puts relevant advertisements on websites based on the site's content (with full consent of the site owner), and which does not entail any type of infringement.  Indeed, even if the entire Google USENET and web archives were dissolved tomorrow, the company would still manage to survive.  Even those archives need not be totally dismantled, however, as an opt-in permission scheme and the elimination of searching for sites by an individual's name or searching for postings by an author would eliminate most of the causes of action specified here.

## Averments Related To Google And Defamation

26.   Because Google does not censor postings, and because it does not allow for third-party removal of messages, its USENET and web archives are guaranteed to contain defamatory material about many individuals that is posted to USENET or websites (or both) by third parties.

27.   The Google archives contain hundreds if not thousands of defamatory messages concerning Plaintiff.  Several of those messages will be outlined in this complaint, but the total number of messages is overwhelming, with more defamatory messages being archived literally every day, because of the high volume of internet users who appear to have made an avocation out of defaming Plaintiff.

28.   Many who defame Plaintiff online do so either anonymously, where authorship of the messages cannot be established, or from distant lands (such as Australia, Britain, or even Eastern Europe), where filing suit in the author's home jurisdiction cannot be established.

29.   Google's USENET archive ensures that defamatory messages concerning Plaintiff (or others) will be published in perpetuity, and unlike their original, ephemeral appearance on a singular message board or website, the archive also ensures that the messages will reach a global

11

audience far greater in size than that for which the message was intended (except when a message is posted with the intent of having it turn up in the archive).

30.   Many individuals who have defamed Plaintiff have taken deliberate steps to use the Google archive to inflict maximum damage upon Plaintiff with their defamation, including such tactics as using his full birth name and identifying his location, so that whenever someone "Googles" Plaintiff, the messages will turn up in the search results.

31.   Even when Google has been made aware that defamatory messages concerning Plaintiff are in its archive, it has refused to disable access to them.

32.   In Parker v. Learn The Skills Corp. (E.D.Pa. #03-cv-6936), Plaintiff alleged a RICO conspiracy, defamation, copyright infringement, tortious interference, and Lanham Act violations against numerous defendants and co-conspirators.  Many of the messages and websites at the source of that controversy were also archived by Google, and therefore republished and/or distributed by them.  In that action, Plaintiff alleged the existence of two separate RICO enterprises: Defendant LTSC, and the "RayFAQ" website located at http://www.ray-gordon.com. The RayFAQ site was finally removed from the internet via a DMCA takedown notice to its upstream provider in March 2004;[11] it had previously been archived by Google and would turn up in its search results.[12]

33.   Google's original response to Plaintiff's notifications regarding the conduct cited in this lawsuit could best be described as intransigence: it claimed immunity under §230 for the defamation, and has held firm regarding the issue of the search-results "biography" caused by typing Plaintiff's birth name into its engine.  Google's inaction despite being notified by Plaintiff draws the inference that their decision to continue its conduct is willful.

---

[11] The DMCA notices to Yahoo and NamesDirect are attached hereto as Exhibits D-1 and D-2, respectively, and incorporated by reference as if fully set forth verbatim herein.
[12] A copy of the amended complaint in Parker v. LTSC (without exhibits) is attached hereto as Exhibit B and incorporated by reference as if fully set forth verbatim herein.

34.   In Parker v. Wintermute, Plaintiff served Google with a subpoena duces tecum for the entire contents of the RayFAQ website.  Google was thus first made aware of the situation at that time.  The subpoena was issued on or about October 17, 2002.

35.   On February 27, 2003, Plaintiff wrote a letter to Google notifying them of the actionable conduct.[13]  He put Google on notice that he was being damaged by the conduct which forms the basis of this lawsuit.  Google responded by doing nothing.

36.   On August 12, 2004, in light of Grace v. EBay, Plaintiff notified Google that he believes that this will become the law of this land and that he will in fact litigate the issues first raised in his letter of February 27, 2003.  He also instructed Google to remove a post by "Hcapper" (Doe #3 in Parker v. Wintermute) from its archives.  Plaintiff later learned that Hcapper's postings generally do not show up in the Google archives for very long, as they are removed either by the user or not archived in the first place.[14]

37.   On August 13, 2004, Plaintiff notified Google that because they had not disabled the search results for his name, that he had no choice but to litigate, and he advised Google that they should take steps to mitigate past damage.[15]

38.   On August 17, 2004, Plaintiff notified Google of two more messages that he did not want in its archive.[16] They including the following statements:

a.     A message by MarciaDP@aol.com of August 9, 2004 which defamed Plaintiff by claiming he had a "rape fantasy/wish fulfillment" (and which used his birth name); and

---

[13] The entire text of the letter is attached hereto as Exhibit C-1 and incorporated by reference as if fully set forth verbatim herein.
[14] The entire text of the letter is attached hereto as Exhibit C-2 and incorporated by reference as if fully set forth verbatim herein.
[15] The letter of August 13, 2004 is attached hereto as Exhibit C-3 and incorporated by reference as if fully set forth verbatim herein.
[16] The letter of August 17, 2004 is attached hereto as Exhibit C-4 and incorporated by reference as if fully set forth verbatim herein.

b.   A message by "Brian Anthony" of August 15, 2004, entitled "Ray Gordon's Address and Phone Number" in response to a third party's posting of a belief that Plaintiff needed to be involuntarily committed, a threat to "call friends in Harrisburg" to make this happen, and citation from the Pennsylvania Code which allegedly supported this contention.



Following is the relevant excerpt from the message:

> 
> Incorrect.
> 
> Just a snippet, because I do not subscribe to the "Copy and paste when someone
> can look it up themselves" method:
> 
> § 7304. Court-Ordered Involuntary Treatment Not To Exceed Ninety Days.
> (a) Persons for Whom Application May be Made.--
> 
> A person who is severely mentally disabled and in need of treatment, as defined
> in section 301(a), may be made subject to court-ordered involuntary treatment
> upon a determination of clear and present danger under section 301(b)(1)
> (serious bodily harm to others)
> 

Yep.
Anyway, here's that address you were looking for (below)
                   - Gordon Roy Parker,
                   (aka. Ray Gordon, psycho/asshole)
                   4247 Locust St, Apt 806,
                   Philadelphia, PA 19104
                   Phone: 215-386-7366
Gordon, Ray  (EVCKISKKZI)
amoderncaveman@aol.com
Snodgrass Publishing Group [suspected SCAM business]
P.O. Box 42814

Philadelphia, PA 19104
Phone: 215-386-3414

39.  Plaintiff avers that this message was posted in retaliation for his having filed a lawsuit

against Doe #3 in Parker v. LTSC (hcapper@aol.com), in violation of 18 USC §1510-13 *et seq.*,

relating to intimidation of a federal litigant or witness, including interference with his

employment and livelihood.

40.  After this action became known to individuals on USENET, the intensity of the

defamation and other conduct against Plaintiff has exacerbated.  For example, since late July,

2004, Plaintiff has been posting to USENET his free horse-racing selections for the New York

racetracks (Belmont, Aqueduct, and Saratoga).  The selections are posted with the subject title of

"FREE Ray Gordon Belmont Selections" and specify which date the selections are made for.

Almost every day, in response to the post, "Brian Anthony" (who posts from a Canadian ISP)

has responded with a message that lists Plaintiff's birth name, his address and telephone number,

and which refers to his company (Snodgrass Publishing Group) as a "suspected SCAM

Business."[17]:

41.  By allowing the messages cited in paragraphs 38-40 above to turn up in search results

for Plaintiff's name, Google has guaranteed republication and distribution of this message,

including the statement from the October 4, 2004 version in which "Brian Anthony" either knew

or should have known was false at the time of publication, namely that Plaintiff's was a

"suspected SCAM business."  Google was put on notice of this specific defamation when it was

served with the original complaint in this action, since the same author made the same

defamatory remark in the message quoted in paragraph 82(b) of that pleading (and recited here in

paragraph 38(b)).

---

[17] The full text of the message, with headers, is attached hereto as Exhibit C-5 and incorporated by reference as if
fully set forth verbatim herein.

15

42.   In this lawsuit, Plaintiff is not taking primary issue with the occasional defamatory remark that lands in Google's archive, but rather with Google's refusal to disable searches on his birth name in their search engine.  It is this specific type of search which causes the greatest damage to Plaintiff.  While the archives should ideally contain no defamation of him at all, that problem could easily be dealt with while the search disabling would prevent the statements from reaching an audience that would never otherwise have seen it (i.e., those individuals who did not visit the newsgroups or message boards of origin, and who only found the statements through a "Googling" of Plaintiff).

43.   On July 24, 2004 at 12:23 a.m., Plaintiff searched Google Groups (USENET) search for the phrase "The Official Ray Gordon FAQ."  Following is a screen capture of the results.



44.   In paragraph 42 of the original Complaint in this action, Plaintiff cited a message from July 24, 2004 posted anonymously to USENET (i.e., an untraceable message) by the alleged publisher of the RayFAQ website.  The subject header was "The ONLY way to stop Gordon Roy Parker." It states, in pertinent part:

> The Honorable James McGirr Kelly
> United States District Court for the Eastern District of Pennsylvania
> U.S. Courthouse

16

601 Market Street, Room # 7613
Philadelphia, PA 19106-1744
(215) 686-2910 Municipal Court Civil Division
courts@phila.gov

Contact: http://courts.phila.gov/email.html
---
Michael E. Kunz, Clerk of Court
United States District Court for the Eastern District of Pennsylvania
U.S. Courthouse
601 Market Street, Room 2609
Philadelphia, PA 19106-1797
PAED_clerksoffice@paed.uscourts.gov
---
Philadelphia Field Office
Federal Bureau of Investigation
8th. Floor, William J. Green Jr. FOB
600 Arch Street
Philadelphia, Pennsylvania 19106

Home Page: http://philadelphia.fbi.gov/
e-mail: philadelphia@fbi.gov

For computer intrusion or hacking
complaints contact: sq9.ph@fbi.gov
---
Pennsylvania State Police, Philadelphia Station
2201 Belmont Avenue, Philadelphia, PA 19131
Bureau of Criminal Investigation
Telephone: 717-783-5524 Fax: 717-705-2306
http://www.psp.state.pa.us/

Computer Crimes Unit: Trooper Jon S. Nelson
Office:610-344-4471
Pager:866-284-1603 (Toll Free)
e-mail: jonelson@state.pa.us
---
Sidney Booker, Special Chief Deputy
John Green, Sheriff
Philadelphia Sheriff's Office
100 South Broad - 5
Philadelphia, Pennsylvania 19106
Phone: 215-686-3530, Fax: 215-686-3971
http://www.phillysheriff.com
e-mail: johgrn@cs.com
---
The City of Philadelphia Police Department
One Franklin Square
Philadelphia, Pennsylvania 19106
http://www.ppdonline.org
16th Police District
3900 Lancaster Ave.   19104
Crime Prevention Officer: (215)686-3163
Victim Assistance Officer: (215)686-3162
---
Captain William Cope
District Attorney's Office

17

Municipal Court Building
1421 Arch Street
Philadelphia, Pennsylvania 19102
Phone: 215-686-8000
e-mail: DA_WEBMAIL@phila.gov
---
Sidney Booker, Special Chief Deputy
John Green, Sheriff
Philadelphia Sheriff's Office
100 South Broad - 5
Philadelphia, Pennsylvania 19106
Phone: 215-686-3530, Fax: 215-686-3971
http://www.phillysheriff.com
e-mail: johgrn@cs.com
---
Edward McCann
Assistant District Attorney
Municipal Court Building
 1421 Arch Street
Philadelphia, Pennsylvania 19102
Phone: 215-686-8000
e-mail: DA_WEBMAIL@phila.gov
---
Frank Montemuro, Jr.
Senior Judge
Philadelphia Superior Court
1101 Market Street
Philadelphia, Pennsylvania 19106
(215) 560-5825
---
Philadelphia Courts
Municipal Court - Civil Division
34 South 11th Street
Philadelphia, PA. 19107
(215) 686-9300 Domestic Relations
(215) 686-9301 Domestic Relations
(215) 686-2910 Municipal Court Civil Division

Contact: http://courts.phila.gov/email.html
courts@phila.gov
---
Eric A. Tilles, Esq.
Associate General Counsel
The University of Pennsylvania
Suite 300, 133 So. 36th St.
Philadelphia, PA 19104-3246
215-746-5250
FAX: 215-746-5222
eric.tilles@ogc.upenn.edu
---
Jeffery T. Karp
Attorney at Law
1 McKinley Square
Boston, MA 02109
---
Matthew S. Wolf
1236K Brace Road

18

Cherry Hill, NJ 08034
---
Crystal D. Deazle
Montgomery, McCracken, Walker & Rhoads, LLP
123 S. Broad Street
Philadelphia, PA 19109
215-772-1500
---
John M. Myers
Montgomery, McCracken, Walker & Rhoads, LLP
123 S. Broad Street
Philadelphia, PA 19109
215-772-7535
Fax : 215-772-7620
---
Jonathan Howland Pyle
Montgomery, McCracken, Walker & Rhoads, LLP
123 S. Broad Street
24th Floor
Philadelphia, PA 19109
215-772-7655
            Email: jpyle@mmwr.com

ALL of these people have a vested interest in upholding the law, as they are all Officers of the
Court. They ALL have had dealings with the CRIMINAL known as Gordon Roy Parker.
Send each of them copies of EVERYTHING you have that Gordon Roy Parker has posted,
claiming victory, slamming the court, and committing the crime of BARRATRY, as well as
stomping on the FIRST AMENDMENT rights of American Citizens to republish PUBLIC
DOCUMENTS from the Court Dockets.  Unless or until EVERYONE stands up and fights
back against this gross violation of our rights, ALL of us will be in danger of losing them. We
will ALL be held captive by Gordon Roy Parker.[18]

45.    Google was put on notice by the original complaint in this action that the message was

defamatory, yet has done nothing to remove it from their archives.

46.    On October 20, 2004 at 3:03 a.m., Plaintiff searched for the posting on Google

through its Message ID, and not only did the message turn up, but it was accompanied by three

"sponsored links" for websites relating to searching court records for information on individuals.

Following is a screenshot of what Plaintiff found.

---

[18] The message ID is 8EQ4E2GF38193.9322800926@anonymous.  The message is archived at google at
http://groups.google.com/groups?selm=8EQ4E2GF38193.9322800926%40anonymous&output=gplain.  The text of
the full message is attached hereto as Exhibit C-6 and incorporated by reference as if fully set forth verbatim herein.



47.   Plaintiff avers that Google has knowingly derived an unfair economic advantage and pecuniary benefit at the expense of Plaintiff by knowingly republishing and distributing defamatory material concerning him, while using this material as a platform for its advertisers.

48.   Plaintiff avers that the messages cited in paragraphs 43-47 above were motivated by the author's desire (and Google's desire as a republisher/distributor) to intimidate and harass Plaintiff because Plaintiff had filed a lawsuit (Parker v. LTSC) in which the author was named as Defendant John Doe #8, in violation of 18 USC §1513(b), and to interfere with his employment and livelihood in violation of 18 USC §1513(e) (it is self-evident from the posting that Doe #8 was aware of the federal lawsuits).

49.   Plaintiff avers that Google's position on this matter is clear in that it believes it cannot be held liable in this jurisdiction as a distributor for defamatory messages.

50.   Plaintiff avers that Google's archive, in its totality and through the specific messages cited herein, as well as similar messages omitted here for brevity, portrays Plaintiff in a false light.

20

51.   In paragraph 50(b) of the original complaint, Plaintiff cited a message in which the author ("John C. Randolph") used Plaintiff's birth name and called him unemployable, including the following statements:

> A Modern Caveman wrote:
> >
> > Isn't this newsgroup for SEDUCTION ADVICE?
>
> Yeah, but there's this snivelling loser who keeps clogging it up with off-topic bullshit like whining about how unemployable he is.  If you could just get that Gordon Roy Parker character to fuck off, this neswgroup could get back on track.

52.   At the time of publication, Mr. Randolph either knew or should have known that Plaintiff was not only not unemployable, but in fact employed, as well as owning his own business, and that he was in possession of a wealth of marketable skills upon which he can capitalize at any time.

53.   On October 20, 2004 at 5:04 a.m., Plaintiff found the message once again in Google's archive, complete with sponsored links for "NLP Seduction" products which compete directly against Plaintiff's published works for market share and revenue.  The following screenshot captured these results:



54.  As Plaintiff had argued in the original complaint, the volume of defamation concerning him in Google's archive is so massive, and accumulating so rapidly, that listing every last message here would be cumbersome and duplicative of what will be included in the RICO case statement (or an amended complaint should this Court rule that more must be alleged initially).  The messages cited herein show, however, that even when Google is notified of the defamatory content of a message, it still refuses to remove it from their archive.  They are also especially illustrative of the problem here because one author is from Canada, while the other is anonymous, and because both messages reference Plaintiff's birth name.

### Averments Related To Google And Invasion Of Privacy/Copyright Infringement

55.  Plaintiff avers that whenever an individual's name is entered into its search engine, that Google's website compiles an unauthorized biography of that individual, returned in the form of search results that contain actual statements from the source messages and websites in the archive, and links to those sources.

56.  Plaintiff avers that during the relevant times in this action, that at least one (and more likely several dozen or hundred individuals) have "Googled" Plaintiff by typing his full birth name into the Google search engine.

57.  At 12:28 a.m. of July 24, 2004, Plaintiff typed "Gordon Roy Parker" into Google's web search and retrieved the following results:

22



58.   On July 24, 2004 at 12:39 a.m., Plaintiff typed "Gordon Roy Parker" into Google's

USENET search engine (http://www.google.com/group_search), and in addition to the search

results, a sponsored link[19] appeared on the right side of the webpage, as follows:



59.   On October 20, 2004 at 3:58 a.m., Plaintiff again typed "Gordon Roy Parker" into the

Google Groups archive, and the following screenshot captured the results, which showed no

particular change from before the commencement of this action.  Indeed, on the *very first page*

of the search results, to which sponsored links were again included, includes a message posted by "JJT" under the subject header of "Re: Gordon Roy Parker's Mental Illness(s)"



60.   On October 20, 2004 at 4:10 a.m., Plaintiff entered "Gordon Roy Parker" into Google's web search engine, and the following screenshot captured the results which showed no particular change from before the commencement of this action.  Indeed, the first page of the search results make an explicit reference to Plaintiff as a "child abuser."

---

[19] The sponsored link appears to have been triggered by the use of the name "Parker," although the search was specifically for Plaintiff's name.



61.   Plaintiff avers that at the time of publication, the "Editorial Staff" either knew or should have known that the above statements were false and that Plaintiff is neither "a criminal" nor has he "had dealings" (in the criminal sense) with any of the above-mentioned agencies, and further avers that its actions were motivated by a vicious, personal malice towards Plaintiff responsible for an intent to cause economic and other harm to his reputation and to him, because of a long-running internet conflict and, recently, his legal and DMCA actions relating to the RayFAQ.

62.   Plaintiff avers that he has suffered harm to his reputation, and economic harm caused by employers being less likely to hire him, and businesses or individuals being less likely to do business with him, after searching for his name on Google ("Googling") Plaintiff.

63.   Because of "Googling," anytime Plaintiff encounters anyone, anywhere – be it for a job, place to live, friendship, relationship, in the course of his business, or his romantic relationships – messages such as this one will turn up in a Google USENET search, and in a Google web search if the USENET messages have been archived on any third party websites.

64.   Plaintiff avers that, because Google did not disable searches on Plaintiff's name even after being informed of the results of the first complaint, that it knowingly and willfully has allowed this material to remain in its archive and to be discovered in searches directed at Plaintiff under his birth name.

65.   It is worth noting that even if Plaintiff had never established any presence on the internet, that his name would still turn up in search results, because of an article which appeared in the *Daily Pennsylvanian* on March 20, 2004, reporting on Plaintiff's employment-discrimination lawsuit against the University of Pennsylvania (Parker v. University of Pennsylvania, E.D.Pa. #02-cv-567).  The article itself, which is still archived on the DP website (and Google), was the subject of libel action, Parker v. Tilles et al., (Court of Common Pleas of Philadelphia, #02-1068, September Term, 2002).  Consequently, any potential employer who "Googles" Plaintiff's name will learn that he has filed a Title VII lawsuit.

66.   In the past year, an age-discrimination Employment lawsuit has been filed against Google in the federal court system of the United States, alleging that Google has discriminated against at least one of its current or former employees or applicants on the basis of their age.

67.   An internet search by Plaintiff, conducted at 12:30 a.m. on Tuesday, August 3, 2004, and for the search term "Ray Gordon FAQ" from the ray-gordon.com website revealed, as the screenshot below demonstrates, that as of this date and time, Google was still caching the RayFAQ website:



68.    As previously averred herein, Plaintiff had successfully removed the RayFAQ from its

original host (through a DMCA complaint to Verio), and removed a republication of the

RayFAQ that appeared shortly thereafter on a Geocities/Yahoo! website.[20]

69.    On July 26, 2004 (shortly after the RayFAQ had been removed from yet another host),

an internet user calling himself "Mr. Brown" reposted the RayFAQ in its entirety.[21]  Once again,

the document calls itself "The OFFICIAL Ray Gordon FAQ" and urges others to act out against

Plaintiff.  It is excerpted in pertinent part:

> The OFFICIAL Ray Gordon FAQ was created to solve the deadlock The idea is to provide
> the warning for new readers by collecting a page with a lot of examples about Ray's
> behavior and his e-mail addresses. We don't need flame wars or comments on Ray's
> writings any more as anyone can read The OFFICIAL Ray Gordon FAQ. If no one posts any
> responses to Ray's writings, he won't get the attention any more and it's only a
> matter of time before he gets tired. So let's let him write but let's also warn
> people without adding to the amount of off-topic articles.
>
> This might be all well intentioned, but as we've all seen, Ray doesn't care how many

---

[20] The DMCA notices to NamesDirect.com and to Yahoo! are attached hereto as Exhibits D-1 and D-2, respectively, and incorporated by reference as if fully set forth verbatim herein.  It should be noted that right-to-publicity and invasion-of-privacy issues are not covered by the DMCA, and that this had posed a problem in the past for Plaintiff.
[21] Part I of the FAQ, which was republished as message-ID PsmdnasItY0x3JjcRVn-vw@is.co.za, is attached hereto as Exhibit E-1 and incorporated by reference as if fully set forth verbatim herein.

People     flame him, nor does he care what his public image is. It will likely take some
intervention somewhere, but until then, usenet will have to deal with it. To find out
what you can do about it, if you are harassed, visit the "What can I do about Ray" page.

70.   Plaintiff avers that "Mr. Brown" posted the RayFAQ to USENET for the explicit

purposes of a) having it turn up under any search for Plaintiff's name, b) letting third parties link

to the Google archive of the posting while claiming immunity under 47 USC §230 (the same law

Google claims gives it immunity), and c) requiring Plaintiff to sue the "source" of the posting in

South Africa, or complain to the South African-based ISP about copyright infringement when

said ISP has no presence in America and nothing to fear from the judgment of an American

court.

71.   Plaintiff avers that the purpose of "Mr. Brown" reposting the RayFAQ was to, in

direct response to learning about Parker v. Learn The Skills Corp., intimidate him by interfering

with his employment and livelihood, and to extort his silence on USENET for the purpose of

obtaining property in the form of market share and audience for Plaintiff's business rivals in the

seduction-advice industry.

72.   Plaintiff avers that the purpose of the reposting of the RayFAQ was to interfere with

Plaintiff's personal life, including any contracts (such as for housing and employment) which

encompass it, for the purpose of destroying his resources and income potential, for the purpose

of obtaining property in the form of market share and audience for Plaintiff's business rivals in

the seduction-advice industry.

73.   Plaintiff avers that the RayFAQ was reposted in retaliation for his having filed Parker

v. Wintermute et al., Parker v. Learn The Skills Corp. and Parker v. University of Pennsylvania.

74.   Despite having been warned about the infringement and other violations of Plaintiff's

rights inherent in the RayFAQ, Google has continued to archive it.  On October 20, 2004 at 6:06

a.m., Plaintiff found the July 26, 2004 republication of the RayFAQ on USENET, complete with sponsored links (this time for ISPs), as the following screenshot shows:



75.    On or about March 28, 2003, Plaintiff posted "Reason #6" from his registered copyrighted work **29 Reasons Not To Be A Nice Guy** to ASF.[22]  Doing this allows readers of USENET to read Plaintiff's writing without having to visit his website.  The posting was only intended for the ASF audience.

76.    In response to the posting, someone posting through an anonymous remailer at Denmark-based dizum.com (whose identity even Dizum does not know), reposted the entire message,[23] which was still archived by Google, as the following screenshot, taken by Plaintiff on Tuesday, August 3, 2004 at 5:24 a.m. shows:

---

[22] As the docket shows, Plaintiff has previously filed the required copyright form with this court, and served a copy on the Library of Congress.
[23] The full text of the infringing anonymous message is attached hereto as Exhibit E-2 and incorporated by reference as if fully set forth verbatim herein.



77. This is but one example of how "involuntary archiving" causes copyright infringement of Plaintiff's works. Google's USENET archive makes permanent the publication to USENET of anything not "nuked" by the author. While it is true that a DMCA takedown notice could remove a singular infringing article from the web, the fact is that such notices would have to be sent perpetually, as well as having Google's website constantly monitored for archive infringement, thus unfairly burdening Plaintiff by draining his resources in a manner similar to how Napster drained the resources of the RIAA. This makes Google analogous to Napster in that one could, in theory, notify Napster of every possible infringement, but the scale problems are similar. The DMCA generally proscribes an ISP or content provider allowing repeat infringement to occur.

78. In addition to the involuntary archiving of Plaintiff's registered work (Reason #6), many other messages of Plaintiff's have been involuntarily archived by third parties, some of whom post anonymously, thus making it impossible, short of a DMCA notice for each

infringement, for Plaintiff to remove the messages under Google's policy that only the author can "nuke" a posting.

79.   Plaintiff attempted recently to locate the "Reason #6" message cited in the original complaint, above, and found that it had been removed from the Google archive since commencement of this action.  However, by searching the archive for postings in alt.seduction.fast that contained the term "Reason #6" he did find a response to his message which was archived, and which included the copyrighted material.  The screenshot of this search appears below:



80.   The "RayFAQ website" billed itself as "The OFFICIAL Ray Gordon FAQ: A document about Gordon Roy Parker."

81.   Plaintiff avers that the RayFAQ website constitutes a violation of Plaintiff's right to publicity, because it called itself the "official Ray Gordon FAQ" in an illegal use of Plaintiff's name in a context that makes it appear to the reasonable individual that Plaintiff had somehow endorsed the site.

82.   Alternative and in addition to paragraph 81 above, Plaintiff avers that the RayFAQ website is a defamatory invasion of his privacy in that it portrays him in a false light, or alternatively, that it invades his privacy through unnecessary publication designed to expose Plaintiff to hatred, contempt and ridicule.

## Averments Related To Google And Harassment Of Plaintiff

83.   The Google archives contain dozens if not hundreds of messages in which Plaintiff has been harassed or threatened by third parties.  The messages date back several years, and have intensified since the filing of this action.  Those messages were outlined in painstaking detail in Parker v. LTSC.

84.   Since Google filed its motion to dismiss this action, a number of USENET posters have interpreted this as a declaration of "open season" on Plaintiff.  As a direct and proximate result of that filing, several messages which threaten Plaintiff while invoking various legal statutes and procedural rules, as well as making threats against his person and even his life, have appeared.

85.   One internet user who has begun harassing Plaintiff recently goes by the handle of "Byte Me."  On October 8, 2004, in response to a claim by this author that Plaintiff was unemployed, he asked (rhetorically) if he should use his paycheck to file a defamation suit.  In response, it was implied that individuals who work for this very courthouse have been badmouthing Plaintiff.

> Want me to use my next paycheck to file a defamation suit against you?
>

Considering the regard in which you are held in the Federal Courthouse in Philly (it's been checked up on) I suggest that if you do, you will quickly find the case moved to San Francisco, based on my lack of presence in Pa.  I have been told that the judges would be happy to move you to another jurisdiction just to be done with you. So you may take your next "paycheck" and go buy yourself some valium or do anything else you think you have the balls to do.[24]

---

[24] The full text of the message is attached hereto as Exhibit F-1 and is incorporated by reference as if fully set forth verbatim herein.

86.   On October 20, 2004, Plaintiff entered the Message ID into Google's groups archive, and, as the following screenshot shows, Google archived this posting:



87.   On October 13, 2004, "Byte Me" posted a message to alt.seduction.fast which contained the following statements concerning Plaintiff, including a threat of involuntary commitment for mental illness and a claim that Defendant's attorneys will be seeking to remove him from the internet:

> Don't worry, I have it on good authority that he has stepped on the wrong toes this time. I think he will be removed from the internet in the next few months. ***Google's attorneys are not amused at his latest round of "vexatious litigation" and intend to remove him from the virtual world.*** People are getting tired of his bringing his flame wars to the courthouse. ***The white coats are not far off now....***BM[25]

88. Plaintiff avers that the message cited in paragraph 87 above was a direct and proximate cause of Google referring to Plaintiff as a vexatious litigant in its motion to dismiss this action.

89. On October 20, 2004, Plaintiff entered the ID for this message into Google's archive, which returned the message, as the following screenshot shows:

---

[25] The full text of the message is attached hereto as Exhibit F-2 and is incorporated by reference as if fully set forth verbatim herein.



90.   On October 14, 2004, "Byte Me" posted a message to ASF on USENET entitled

"Internet pest removal" which contained the following statements concerning Plaintiff:

> Actually there is a way to remove ligatious internet pests.  Google won't do this, but others
> can.  ***Anyone that he has complained on, or any individuals he has sued can simply file a
> suit against him when it's dismissed, and add AOL and Verizon as defendants for failing to
> enforce their Acceptable Use  Policy.***  I'm quite sure there have been dozens of complaints
> against his threats and spamming.  You won't win anything from them except this, they will
> drop him like a hot brick, and after they have dropped him for getting them sued, nobody else
> will take him as a customer either. (Emphasis Added).[26]

91.   On October 20, 2004, at 6:55 a.m., Plaintiff entered the Message ID into Google's

USENET archive, where, as the following screenshot shows, the message was returned, along

with sponsored-link advertisements for various legal services:

---

[26] The full text of the message is attached hereto as Exhibit F-3 and is incorporated by reference as if fully set forth
verbatim herein.



92. Plaintiff avers that the message cited in paragraph 91 above constitutes the unauthorized practice of law.

93. On October 18, 2004, in response to a post with the subject title "When Ray is killed," "Byte Me" posted the following statements concerning Plaintiff:

> Why would anyone bother, but I think his commitment would be more likely......nobody would waste the time on him to kill him.   He will just keep blowing off and filing stupid lawsuits until the Court gets tired of him and sends him back to the looney bin where he belongs.
> BM
>
> "The Voice of Reason" <i_hate_hibs@hotmail.com> wrote in message news:87bbd508.0410180649.527cbe95@posting.google.com...
> > ...will anyone go to his funeral?[27]

94. On October 20, 2004, at 8:58 a.m., Plaintiff entered the Message ID into Google's groups search engine and the message was retrieved from the archive, as the following screenshot shows:

---

[27] The full text of the message is attached hereto as Exhibit F-4 and is incorporated by reference as if fully set forth verbatim herein.



95.  Plaintiff avers that "Byte Me's" messages were posted in an attempt to harass and

threaten plaintiff (with involuntary commitment and with harm to his business and property

interest in the internet) because of his federal litigation in violation of 18 USC §1513(b), as well

as an attempt to interfere with his livelihood in violation of 18 USC §1513(e), a provision of the

Sarbanes-Oxley Act.

96.  Mere threats of "white coats" and internet bannings are tame in comparison to some of

the other threats received by Plaintiff, such as the one posted by a man believed to be Rodney

Braithwaite, of Australia, on October 17, 2004.  The message stated, in pertinent part:

> Ray Gordon wrote:
> >>FACT: A domain NAME is not a website. A domain name stores nothing, can
> >>be pointed legally anywhere on the world wide web, and there are no
> >>requirements for any domain name contact to know who authors
> >>intellectual property on whatever site the domain name points to.
> >
> >
> > Wanna bet?
> >
> >
> >
> Hello Gordon
>
> You know, you are really such a complete wanker. Get a life you little cretin and don't
> bother to fuck off somewhere else - it's too late. *I'm still going to get Banshod to take
> you out. B likes .22 subsonic at close range to the head.* Only slightly messy and very

effective. One of the great things is that when this NG goes real quiet and you dont show up for a few weeks we'll know that B has tapped you. Get mom life insurance on you and leave her a parting gift for after you are history.[28]

97.   On October 20, 2004 at 9:04 a.m., Plaintiff entered the Message ID into Google's

groups search engine and the message was retrieved from the archive, as the following

screenshot shows:



98.   This message was not posted anonymously, as it originated from btinternet.com.  The

message also listed an e-mail address from that ISP.  On October 20, 2004 at 9:06 a.m., Plaintiff

entered the author's listed e-mail address into Google's web archive, and a page identifying the

author turned up, as the following screenshot demonstrates:

---

[28] The full text of the message is attached hereto as Exhibit F-5 and is incorporated by reference as if fully set forth verbatim herein.



99.   This cached webpage shows the e-mail address searched for to apparently belong to one Rodney Braithwaite.  A search for that name turned up a page located at http://www.ajstas.netfirms.com/page_8.htm, which listed Mr. Braithwaite as a contact for a group he belonged to (the "Australia Japan Society), along with an e-mail address at what purports to be his website: rgb@wanderingimages.com, a site devoted to the photography of Mr. Braithwaite.

100.   Plaintiff then searched the "Whois" data for wanderingimages.com, and Mr. Braithwaite's contact information turned up, as follows:



101. On October 19, 2004, the user believed to be Mr. Braithwaite then posted a second threatening message to Plaintiff on USENET, which contained the following statements: "A more fucked up dude I have never seen. Banshod is coming." (Emphasis Added).[29]

102. Plaintiff avers that Google has realized pecuniary advantage through the unjust enrichment of its archive with these messages, which are used to sell AdWords advertisements and to lure traffic to its site, from which revenue is later drawn or attempted to be drawn.

103. Plaintiff avers that Google either foresaw or should have foreseen that its archive and search capabilities, which it refused to alter even after this lawsuit was filed, would cause Plaintiff to be subjected to harassment of this nature.

104. Plaintiff avers, as shown by the content of the messages cited herein, that the purpose of Mr. Braithwaite's posting was to harass Plaintiff because of his federal lawsuit against Google in violation of 18 USC §1513(b), as well as an attempt to interfere with his livelihood in violation of 18 USC §1513(e), a provision of the Sarbanes-Oxley Act.

---

[29] The full text of the message is attached hereto as Exhibit F-6 and is incorporated by reference as if fully set forth verbatim herein.

105. The two recent threats against Plaintiff are merely the tip of the iceberg. The Google archive dutifully collects many threats made against Plaintiff, including those outlined in Parker v. Wintermute, Parker v. LTSC, and even Parker v. University of Pennsylvania (E.D.Pa. #02-cv-567), where an individual named Osgaldor Storm posted threats against Plaintiff in violation of Sarbanes-Oxley in response to that litigation.

106. Plaintiff avers that Google has shown depraved indifference to Plaintiff's physical well-being by archiving the threats made against him, threats which will be seen by the public who searches the archive, and which have the capacity to incite others into acting out against Plaintiff, at grave risk to his person, in a manner which has caused for him to fear for his physical safety.

## Averments Related To Google And RICO/Civil Conspiracy

107. Google is a "walking §1962(a) violation" in that it has become corrupted by dozens if not hundreds of RICO enterprises which exist on the web. Google is the weapon of choice for several internet RICO enterprises, and participates in their activities by providing the necessary resources in the form of its archives for the RICO participants to carry out their conspiracy.

108. The events which lead to Parker v. Learn The Skills Corp. are typical of what happens whenever an "internet cabal" decides to target an individual. Google plays a role in this process and profits from that role through the use of its site to facilitate the enterprise and through the advertisements it sells.

109. The RICO enterprises at issue in Parker v. LTSC here benefit from Google because Google allows them either to link to material through their site, or to simply tell people which terms to search for. For example, one might say "do a google search for [Plaintiff] for more information about him," while knowing full well that the RayFAQ (illegally archived on Google) will turn up.

110. Because of Plaintiff's success in removing the RayFAQ from its host websites, a new RICO conspiracy has taken form on the internet. Google is the RICO enterprise for this conspiracy in that it is engaged in the legitimate business of providing internet searches, but has been corrupted by the RICO conspirators for the purpose of committing predicate acts against Plaintiff.

111. The predicate acts listed above are but a few examples of dozens if not hundreds of other predicate acts based on intimidating Plaintiff. Since this is a complaint for more than just RICO violations, Plaintiff has pled the enterprise minimally, and will outline the entire conspiracy in his RICO case statement or in an amended complaint should this Court deem it necessary. The predicate acts here are "Google-specific" in that Google's search engine is relied upon by the enterprise to further its aims. The overall enterprise is much larger than what is pled here.

112. For this pattern of racketeering activity, Google became the RICO enterprise, as it had to be corrupted by the conspirators who found that they could no longer place the RayFAQ on websites without it being taken down pursuant to the DMCA, and who instead resorted to posting it to USENET with the full knowledge that it would be archived on Google.

113. If there were any doubt about Google's feelings towards the RICO enterprises, its conduct since the original complaint was filed has put that to rest. Even armed with the full knowledge of what damages were being caused to Plaintiff, by whom, and having been advised of the specific nature of Google's role in the RICO conspiracy, it has knowingly, willfully, and wantonly aided and abetted this RICO enterprise in violation of 18 USC §1962(d). Any claims made by Google in its motion to dismiss that it was somehow detached from this enterprise are no longer valid in light of its post-filing conduct, which has added the elements of knowledge, awareness, and premeditation into their conduct.

114. Plaintiff avers that were it not for the existence of Google, and its policies, including but not limited to those which relate to searching for individuals under their birth names and illegally archiving copyrighted messages or anonymous messages that cannot be actioned even when actionable, that a substantial amount of the damage incurred by the conduct averred herein would not have found its way to Plaintiff. These damages are a direct and proximate result of Google's decisions to allow searches for Plaintiff's birth name, both before and after the filing of this action, with the decision made post-filing constituting a deliberate and malicious choice to continue to inflict this damage.

115. Plaintiff avers that Google itself has now chosen to aid and abet the RICO enterprises set forth in Parker v. LTSC (as well as in this action) in part because of its motivation to retaliate against a federal whistleblower/Title VII litigant in violation of the Sarbanes-Oxley Act (18 USC §1513(e)), due to its own malice against discrimination litigants and its alleged practices of age discrimination in employment.

116. In Parker v. LTSC, Plaintiff has alleged that LTSC was the RICO enterprise, and that it had been corrupted by the co-conspirators who were committing predicate acts against Plaintiff for his benefit. Plaintiff now avers that Google's post-filing behavior carried with it full knowledge of the existence of that conspiracy, its purpose, and that Google made a knowing and willful decision to aid and abet this conspiracy in violation of 18 USC §1962(d) by committing otherwise nonpredicate acts (including but not limited to distributor defamation, abuse of process, and copyright infringement) which themselves are actionable under Pennsylvania and federal law.

117. In Parker v. LTSC, Plaintiff has alleged the existence of an association-in-fact RICO enterprise consisting of members of "the seduction community" (some of whom are Google's advertisers). Plaintiff now avers that Google's post-filing behavior carried with it full knowledge

42

of the existence of that conspiracy, its purpose, and that Google made a knowing and willful

decision to aid and abet this conspiracy in violation of 18 USC §1962(d) by committing

otherwise nonpredicate acts (including but not limited to distributor defamation, abuse of

process, and copyright infringement) which themselves are actionable under Pennsylvania and

federal law.

## Averments Related To Specific Predicate RICO Acts

118. As averred in Parker v. Wintermute, Plaintiff has alleged the existence of a RICO

conspiracy based on "the seduction community," an association-in-fact enterprise that is engaged

in the otherwise legitimate business of providing seduction advice to men over the internet,

including but not limited to on USENET and the ASF group in particular.

119. Every week (or most weeks) for the past three years now, an operator of Learn The

Skills Corporation ("LTSC") whose e-mail address is Formhandle@fastseduction.com

("Formhandle), has posted a message he refers to as the "ASF FAQ."[30]  The FAQ assumes the

traditional USENET role of informing new visitors to a group about the group's purpose and

accepted policies with regard to off-topic posting and SPAM.

120. In the "ASF FAQ," Formhandle declares LTSC and another website

(www.seduction.com) as the "main group-related sites," thus implying that LTSC's website is

somehow an official extension of ASF.  Indeed, throughout the Amended Complaint in Parker v.

LTSC, Plaintiff has included messages which refer to LTSC's website as the "official ASF

website."

121. Plaintiff avers that the ASF FAQ (which continues to be published weekly to ASF)

constitutes a violation of the Hobbs Act (a predicate RICO act) because it attempts to claim

---

[30] See Exhibit B to this document, ¶¶ 66-70 from the Parker v. LTSC amended complaint, which is incorporated by reference here as if fully set forth verbatim herein, for the relevant excerpts of that FAQ.

public property as private commercial "turf" for the benefit of LTSC, while simultaneously soliciting ASF (and LTSC website) readers to act out against Plaintiff to "protect" that "turf."

122. Plaintiff further avers that the threats and intimidation against him on ASF alleged in Parker v. LTSC were a direct and proximate result of Formhandle's publishing of the ASF FAQ in that it legitimized the conduct by making it appear to third parties that it was somehow sanctioned by "the group."

123. Plaintiff avers that the predicate acts set forth in Parker v. LTSC and here were made with the full knowledge that Plaintiff had reported the above threats (and others) to federal law enforcement, and with the full knowledge and awareness of the "ASF FAQ." Plaintiff further avers that all of these acts were committed with the intent of enforcing the "ASF FAQ" for the benefit of LTSC.

124. Plaintiff avers that each instance of threats, defamation, or other intimidation that appeared on ASF and which were alleged in Parker v. LTSC constitute a violation of the Hobbs Act through an attempt to induce fear in Plaintiff for the purpose of causing him to surrender property in the form of revenue he otherwise would have derived from his writings on ASF. The sum total of predicate acts of this nature total in the hundreds or thousands, in addition to the ones set forth here.

125. Plaintiff further avers that, in addition to the predicate acts set forth herein, each instance of threats, defamation or other intimidation that appeared on ASF and which were alleged here constitute a violation of the Sarbanes-Oxley Act through an attempt to interfere with Plaintiff's employment and livelihood in response to his having reported being threatened on the internet to law enforcement, including but not limited to the threats made by Osgaldor Storm and by "Wintermute."[31]

---

[31] See Exhibit B, ¶¶ 25-58 for a detailed outlining of Wintermute's actionable conduct.

126. Predicate acts which occurred after the original complaint in this action was filed were given sanction and approval by Google insofar that, despite having been put on notice of the RICO enterprise and the prominent role played by its website in furthering the enterprise, as well as the lion's share of the damage being caused as a direct and proximate result, Google continued to allow the enterprise to use its technology.  Google's decision to maintain the status quo even after having been put on notice was premeditated, with the foreseeable consequence of the RICO enterprise feeling empowered by and even aligned with Google.[32]

127. In its motion to dismiss this action, Google claimed that the four predicate acts alleged by Plaintiff were not predicate acts.  Plaintiff had not incorporated the complaint in Parker v. LTSC into the original complaint because he did not believe it was necessary.  While holding that belief, he has incorporated that pleading into this one, along with a much more detailed explanation of both RICO enterprises pled in that complaint in its paragraphs 234-284, including but not limited to the Hobbs Act violations tied to the attempted enforcement of the ASF FAQ, and the additional publication, distribution, and endorsement of the RayFAQ, which Plaintiff also alleged was a violation of both the Hobbs Act (for attempting to enforce the ASF FAQ) and Sarbanes-Oxley Act (for interfering with Plaintiff's employment and attempting to intimidate him in response to his having reported a federal offense to law enforcement).

128.  Further pursuant to "notice pleading" requirements, to use "plain English" to describe the two RICO enterprises from Parker v. LTSC, Plaintiff submits the following:

    a.    The first RICO enterprise is the association-in-fact enterprise which is decentralized on the internet, but which operates primarily through USENET, including but not limited to ASF, and the LTSC website.  Its purpose is to use extortion, threats, harassment, false advertising, coercion, fraud, and other illegal conduct to unjustly enrich itself and its members

---

[32] Indeed, since Google filed its motion to dismiss, several individuals on USENET have acted as if "open season"

commercially. This enterprise has obtained property from Plaintiff in the form of business revenue and goodwill, while it has engaged in violations of the Hobbs Act in an attempt to claim a "public square" on the internet as its personal turf, as well as engaging in other nonpredicate acts, to further its objective of enriching LTSC and other commercial seduction publishers at the expense of Plaintiff.

    b.    The second RICO enterprise is the RayFAQ website, whose purpose is to further the aim of the first RICO enterprise, for the enrichment of itself, Defendant LTSC and any or all of Plaintiff's business competitors, using violations of the Hobbs and Sarbanes-Oxley acts to further its interests and obtain property from Plaintiff in the form of his internet market share.

    129. Plaintiff incorporates and sets forth, as if fully reinstated herein, every averment contained in the Amended Complaint in <u>Parker v. LTSC</u>, and specifically refers the reader to the predicate acts and relevant nonpredicate acts alleged.

## <u>COUNT I: DIRECT COPYRIGHT INFRINGEMENT</u>

    130. Plaintiff incorporates by reference, as if fully stated verbatim herein, the entire contents of paragraphs 1-129 above.

    131. Plaintiff avers that he is the valid owner of the ***registered*** copyright to ***29 Reasons Not To Be A Nice Guy***, including the Reason #6 that he posted to USENET.

    132. Plaintiff avers that when he posted Reason #6 to ASF, that it contained a copyright notice which was stripped from the user(s) who "involuntarily archived" the posting, in violation of the Digital Millennium Copyright Act, which prohibits such altering of a copyright notice, and states a claim for relief on that basis.

    133. Google's continued archiving of Reason #6 constitutes a willful infringement of his copyright, or alternatively, the inevitable byproduct of Google's USENET archive, which

has been declared on Plaintiff.

provides for "involuntary archiving" of USENET postings. Their initial archiving of Reason #6, while not specifically intentional, was a direct and proximate result of Google's conscious decision to "archive the web." He states his claim for relief on both of these bases.

134. Google has illegally profited from the infringement set forth hereinabove through the sale of advertising, and goodwill by luring revenue-generating traffic to its website.

135. In addition to the infringement of Reason #6 which occurred when Google placed it into their archive, that each time the article has been accessed in the archive, it constitutes a separate act of direct copyright infringement by Google.

136. Each time an excerpts from Plaintiff's website is returned in Google's search results, that it constitutes a separate act of direct copyright infringement by Google in violation of the Digital Millennium Copyright Act (18 USC §512), because the excerpt is published in the search result without the copyright notice that appears on the original page, such as is the case with any of Plaintiff's "29 Reasons" or other e-books, all of which contain such a notice on top of their pages.

137. The foregoing acts of infringement by Google have been willful, intentional, and purposeful, in disregard of and indifference to the rights of Plaintiff.

138. Google's conduct, as averred herein, constitutes direct infringement of Plaintiff's copyrights and exclusive rights under copyright in violation of the Copyright Act, 17 USC. §§106, and §512, *et seq.*, the Digital Millennium Copyright Act.

139. As a direct and proximate result of the contributory infringements by Google of Plaintiff's copyright and exclusive rights under copyright, Plaintiff is entitled to statutory damages of $150,000.00 per infringement pursuant to 17 U.S.C. § 504(c), for each infringement.

140. Plaintiff is further entitled to his attorney fees (to the extent he has or will have secured counsel), and full costs pursuant to 17 USC. §505.

141. In addition to its infringement of Plaintiff's registered work "Reason #6," Google has continued to archive USENET postings, including those made by Plaintiff, either directly through its Google Groups archive, or involuntarily, when Google archives messages from third parties which contain all or part of Plaintiff's messages. Plaintiff has no means other than injunctive relief to enjoin this infringement. It should be noted that any such future works covered here cannot be registered until they are created.

142. Google's publication of compilations of Plaintiff's USENET postings through its "author search" feature of its USENET archive constitutes a separate and willful direct infringement of his copyright through the creation of an unauthorized derivative work, for each time a Google user has searched "by author" for any of Plaintiff's known usernames (e.g., LeModernCaveman@aol.com, etc.)

143. In addition to USENET copyright infringement, Google's web archive also contains illegal copies of Plaintiff's through third-party websites which contain both his regular writing and USENET writing.

144. Google's conduct, as hereinabove averred, is causing and, unless enjoined and restrained by this Court, will continue to cause Plaintiff great and irreparable injury that cannot fully be compensated or measured in money. Plaintiff has no adequate remedy at law. Pursuant to 17 USC §502, Plaintiff is entitled to preliminary and permanent injunctions prohibiting further direct infringements of Plaintiff's copyrights.

## COUNT II: CONTRIBUTORY COPYRIGHT INFRINGEMENT

145. Plaintiff incorporates by reference, as if fully stated verbatim herein, the entire contents of paragraphs 1-144 above.

146. As set forth hereinabove, a tremendous amount of copyright infringement takes place on and by virtue of Google's website every day. These infringements occur whenever a Google

48

user, without authorization of the copyright owner, views infringed content, constituting an unauthorized distribution and resulting in an unauthorized copy. Each and every one of these infringements is facilitated, encouraged, and made possible by Google. It is on this basis that Plaintiff states his claim for relief in this count.

147. Through its conduct averred herein, Google has engaged and continues to engage in the business of knowingly and systematically inducing, causing, and materially contributing to the above-described infringement of Plaintiff's copyrights and exclusive rights under copyright in the material (messages and websites) in controversy in this action.

148. Google's publication of compilations of Plaintiff's USENET postings through its "author search" feature of its USENET archive constitutes a willful contributory infringement of his copyright through the creation of an unauthorized derivative work.

149. Plaintiff avers that absent injunctive relief enjoining future violations, that his copyrights will continue to be systematically violated through the involuntary archiving of his USENET postings by third parties (which are archived by Google), and through the archiving of third-party websites which themselves archive posts, even if Google does not do so itself in its USENET archive.

150. The foregoing acts of infringement by Google have been willful, intentional, and purposeful, in disregard of and indifference to the rights of Plaintiff.

151. Google's conduct, as averred herein, constitutes contributory infringement of Plaintiff's copyrights and exclusive rights under copyright in violation of the Copyright Act, 17 USC §§106, and §512, *et seq.*, the Digital Millennium Copyright Act.

152. As a direct and proximate result of the contributory infringements by Google's of plaintiffs' copyrights and exclusive rights under copyright, plaintiffs are entitled to damages and Google's profits pursuant to 17 U.S.C. § 504(b) for each infringement.

153. Plaintiff is further entitled to his attorney fees (to the extent he has or will have secured counsel), and full costs pursuant to 17 USC. §505.

154. Google's conduct, as hereinabove averred, is causing and, unless enjoined and restrained by this Court, will continue to cause Plaintiff great and irreparable injury that cannot fully be compensated or measured in money. Plaintiff has no adequate remedy at law. Pursuant to 17 USC §502, Plaintiff is entitled to preliminary and permanent injunctions prohibiting further direct infringements of Plaintiff's copyrights.

## COUNT III: VICARIOUS COPYRIGHT INFRINGEMENT (SEARCH ENGINE)

155. Plaintiff incorporates by reference, as if fully stated verbatim herein, the entire contents of paragraphs 1-154 above.

156. At all times relevant herein, Google had the right and ability to supervise and/or control the infringing conduct of itself and its users by, without limitation, preventing or terminating a user's access to Google's computer servers and/or by refusing to index and create links to infringing material, but has failed to exercise such supervision and/or control. As a direct and proximate result of such failure, Google's users have infringed Plaintiff's copyrights by downloading the infringing material to their computer hard drives from Google's website, as set forth above. It is on this basis that Plaintiff states his claim for relief in this count.

157. At all times relevant herein, Google derived substantial financial benefit from infringements of Plaintiff's copyrights by its users in the form of advertising revenue and goodwill. Plaintiff is informed and believes, and on that basis avers, that the number and amount of these fees is related directly to the number of users of Google, which, in turn, is dependent directly on Google's facilitation of and participation in the alleged infringement. Google further is undertaking a purposeful strategy to make its company more attractive to potential advertisers and investors by increasing the number of users, and thereby the volume of infringement.

158. The foregoing acts of infringement by Google have been willful, intentional, and purposeful, in disregard of and indifference to the rights of Plaintiff.

159. Google's conduct, as averred herein, constitutes contributory infringement of Plaintiff's copyrights and exclusive rights under copyright in violation of the Copyright Act, 17 USC §§106, and §512, *et seq.*, the Digital Millennium Copyright Act.

160. As a direct and proximate result of the contributory infringements by Google's of plaintiffs' copyrights and exclusive rights under copyright, plaintiffs are entitled to damages and Google's profits pursuant to 17 U.S.C. § 504(b) for each infringement.

161. Plaintiff is further entitled to his attorney fees (to the extent he has or will have secured counsel), and full costs pursuant to 17 USC. §505.

162. Google's conduct, as hereinabove averred, is causing and, unless enjoined and restrained by this Court, will continue to cause Plaintiff great and irreparable injury that cannot fully be compensated or measured in money. Plaintiff has no adequate remedy at law.  Pursuant to 17 USC §502, Plaintiff is entitled to preliminary and permanent injunctions prohibiting further direct infringements of Plaintiff's copyrights.

## COUNT IV: DEFAMATION[33]

163. Plaintiff incorporates by reference, as if fully stated verbatim herein, the entire contents of paragraphs 1-162 above, with specific emphasis on the averments related to defamation as averred.

164. Plaintiff's four letters to Google spanning from February 27, 2003 to August 17, 2004 put it on notice that it was distributing specific defamatory material concerning Plaintiff, with the defamatory material including but not limited to the statements outlined in that correspondence, and in this amended complaint, as follows:

a.  The false and malicious statement cited in paragraph 38(a) claiming Plaintiff had a "rape fantasy/wish fulfillment."

b.  The false and malicious statement cited in paragraph 38(b) referring to Plaintiff's business as a "suspected SCAM business."

c.  The false and malicious statement cited in paragraph 51 (from paragraph 50(b) in the original complaint) that imputes unemployability upon Plaintiff.

d.  The false and malicious statements cited in Plaintiff's letters to Google (see Exhibits C-1 thru C-4).

e.  The false and malicious statement cited in paragraphs 44-46 that refer to Plaintiff as a "CRIMINAL."

165. Service of the original Complaint in this action put Google on notice regarding the defamatory nature of the statements in controversy in that complaint.

166. Service of a subpoena duces tecum in <u>Parker v. Wintermute</u>, put Google on notice regarding all defamatory material outlined in that complaint, and of the full contents of the RayFAQ website as archived in their cache (the target of the subpoena).

167. Despite having been put on notice regarding the defamatory nature of the relevant statements contained hereinabove, Google continued not only to archive said material, but in many or most cases, included "sponsored links" from which it profits with the republication. Google has therefore acted with knowledge of falsity or reckless disregard for the truth (actual malice).

168. At the time of publication (post-filing), Google either knew or should have known that the statements in controversy were false, having been put on notice by Plaintiff that they were. Despite this, Google continued to distribute and publish them

---

[33] This count incorporates all forms of defamation under Pennsylvania law, including libel, slander, trade libel, and

169. The defamatory statements in controversy in this action have been read by at least one and in some cases by a substantial number of third parties who were capable of understanding the statements' defamatory character.

170. As a direct and proximate result of publication of the defamatory material, Plaintiff has been exposed to hatred, contempt and ridicule to the extent that third parties are likely to hold Plaintiff in a lower esteem than they otherwise would, and his reputation has been irreparably harmed.

171. As a direct and proximate result of publication of the defamatory material, Plaintiff has suffered pecuniary harm in the form of lost income and sales, lost goodwill, loss of audience to his website, lost potential or actual employment and investment opportunities, and the loss of potential or actual profitable business partnerships and affiliations.

172. Each instance of a defamatory statement being published, republished or distributed by Google constitutes a separate act of defamation.

173. Google's defamatory conduct as averred in this action entitles Plaintiff to relief under the Pennsylvania common law torts of defamation, libel, trade libel, and invasion of privacy, and it is on this basis that he states a claim for relief in this count. Plaintiff is stating his claim based both on liability for Google as a republisher of the defamation, and as a distributor.

174. The foregoing acts of defamation by Google have been willful, intentional, and purposeful, in disregard of and indifference to the rights of Plaintiff.

175. Plaintiff is entitled to compensatory damages in an amount to be determined at trial, but which is not less than FIFTY MILLION DOLLARS ($50,000,000,00 US).

176. Plaintiff is further entitled to the maximum punitive damages allowed by law, costs of suit (including any reasonable attorney fees incurred), injunctive relief sufficient to terminate the

false-light invasion of privacy.

actionable conduct, an accounting of any profits derived from the defamatory publication, and such other and further relief as this Court shall deem just and proper.

## COUNT V: INVASION OF PRIVACY

177. Plaintiff incorporates by reference, as if fully stated verbatim herein, the entire contents of paragraphs 1-176 above, with specific emphasis on those averments which relate to defamation and invasion of privacy.

178. Plaintiff avers that the act of any third party "Googling" him on the Google website (i.e., typing his birth name "Gordon Roy Parker" or any derivative thereof into its search engine) causes Google to create, on demand, an unauthorized biography of Plaintiff that is an invasion of his right to privacy under the Pennsylvania common law, a false-light defamation of him as averred, and states his claim for relief in this count on this basis.

179. Plaintiff avers that he has been "Googled" by third parties many times during the period in controversy in this action and continues to be "Googled" on a regular basis as per the actions of the RICO conspirators in this and other lawsuits mentioned herein, potential employers and investors, his customers, and other third parties with whom Plaintiff interacts.

180. Plaintiff avers that Google's website collectively portrays him in a defamatory false light as the direct result of the conduct set forth herein, in a manner which a reasonable observer would find highly offensive, and that it has shown reckless disregard for the truth in allowing itself to collect any and all defamation against Plaintiff which is anywhere on the internet and literally rebroadcasting it to the entire globe.

181. Plaintiff avers that any advertising revenue from illegal searches of Plaintiff's birth name constitute a violation of his right to publicity under the Pennsylvania common law, and prevents Plaintiff from realizing the full, exclusive use of his name and likeness and right to profit from it. He states a claim for relief in this count on this basis.

182. Plaintiff avers a separate invasion of his privacy for each time his name is searched on Google.

183. The foregoing acts of invasion of privacy and right-to-publicity violations by Google have been willful, intentional, and purposeful, in disregard of and indifference to the rights of Plaintiff.

184. As a direct and proximate result of Defendant's wanton and willful conduct, Plaintiff has suffered pecuniary harm in the form of lost wages, lost business revenue, lost goodwill, pain and suffering, lost potential employment, and lost accumulated wealth, because his reputation in the eyes of others has been unjustly diminished.

185. Plaintiff is entitled to compensatory damages in an amount to be determined at trial for lost profits relating to his name, for damage to his reputation caused by the invasion of privacy and right to publicity, and for any other pecuniary losses established at trial.

186. Plaintiff is entitled to compensatory damages in an amount to be determined at trial, but which is not less than FIFTY MILLION DOLLARS ($50,000,000,00 US).

187. Plaintiff is further entitled to the maximum punitive damages allowed by law, costs of suit (including any reasonable attorney fees incurred), injunctive relief sufficient to terminate the actionable conduct, an accounting of any profits derived from publication, and such other and further relief as this Court shall deem just and proper.

## COUNT VI: NEGLIGENCE

188. Plaintiff incorporates by reference, as if fully stated verbatim herein, the entire contents of paragraphs 1-187 above.

189. Having been put on notice that Plaintiff was being threatened in messages and websites which it archives, and having been notified of the contents of the RayFAQ website yet

continuing to archive it, Google has failed to protect Plaintiff from the foreseeable harm caused by its archives.

190. Under the Pennsylvania common law, Google has a duty to protect individuals from foreseeable harm arising from any foreseeable hazard relating to its business.

191. Through its conduct averred herein, Google has breached its by allowing harm to come to Plaintiff whenever he is "googled." The harm takes the forms of defamation, invasion of privacy, incitement of others to commit injury to Plaintiff or to otherwise abuse process of him, and to aid and abet the unauthorized practice of law.

192. Through its archiving of actual physical threats of violence against Plaintiff as averred herein, Google has put and continues to put Plaintiff's physical safety in imminent danger, and has caused harm to his reputation while hindering his general enjoyment of life.

193. Google has supplied its website to its users for use in "googling" Plaintiff despite knowing of the dangers to Plaintiff that are caused by its intended use.

194. The foregoing acts of invasion of privacy and right-to-publicity violations by Google have been willful, intentional, and purposeful, in disregard of and indifference to the rights of Plaintiff.

195. Plaintiff is entitled to relief under the Pennsylvania common law tort of negligence, and states his claim for relief in this count on that basis.

196. Plaintiff is entitled to injunctive relief sufficient to terminate the actionable conduct and to prevent future negligence.

197. Plaintiff is entitled to recover the costs incurred in bringing this claim.

## COUNT VII: LANHAM ACT VIOLATIONS

198. Plaintiff incorporates by reference, as if fully stated verbatim herein, the entire contents of paragraphs 1-197 above.

56

199. Plaintiff avers that Google's republication of the RayFAQ (i.e., "OFFICIAL Ray Gordon FAQ") constitutes false designation of origin and unfair competition ("passing off") under the Lanham Act, in a manner likely to cause confusion among consumers regarding both the origin of the protected work, and Google's right to use it in the course of its business. Google profits from this conduct through an increased user base and through advertising revenue tied to the search results it helps to yield from those who "Google" Plaintiff under his birth or business names.[34]

200. Plaintiff avers that the republication of defamation against Plaintiff in Google's archives constitutes trade disparagement under the Lanham Act (with Google as a distributor) in a manner that will cause consumers to be less likely to do business with or otherwise associate with Plaintiff.

201. Plaintiff has been *competitively* harmed in his publishing business by Google's wanton and willful conduct as averred herein every time a third party encounters defamation of Plaintiff (either in the archive or by "Googling" Plaintiff, his works, or his business), and every time Google is enriched by this conduct (unfair competition). The harm is pecuniary in the form of lost business revenue, lost goodwill, pain and suffering, lost potential employment, and lost accumulated wealth. Defendant Google has also enriched itself illegally through the conduct averred herein through the realization of its own advertising revenue from Plaintiff's target sponsor base.

202. Google's use of Plaintiff's name and likeness through the RayFAQ, has prevented Plaintiff from being able to fully exploit the value of his likeness, and has caused him competitive harm in his business.

---

[34] Google's logic, applied to the offline world, could yield us "Google TV," whereby Google broadcasts every television station in its cache, and sells its own advertising, or "Google University," where it uses materials from other universities to form its curriculum. There is already "Google News," which culls headlines and stories from all over the world to present to internet readers.

203. The foregoing acts of passing off, trade disparagement and unfair competition by Google have been willful, intentional, and purposeful, in disregard of and indifference to the rights of Plaintiff.

204. The trade disparagement alleged herein was published/distributed by Google with knowledge of falsity and/or reckless disregard for the truth, because at all times of republication and distribution after having been put on notice by service of the complaint in this action, Google did not cease and desist, but instead chose to leave the status quo intact.

205. For the conduct averred hereinabove, Plaintiff is entitled to relief under the Lanham Act. He states his full claim for relief on this basis.

206. Plaintiff is entitled to compensatory damages in an amount to be determined at trial.

207. Plaintiff is entitled to the maximum punitive damages allowed by law, in an amount to be determined at trial.

208. Plaintiff is entitled to injunctive relief sufficient to terminate the actionable conduct and to prevent future violations of the Lanham Act.

209. Plaintiff is entitled to recover the costs incurred in bringing this claim.

## COUNT VIII: RACKETEERING (GOOGLE)

211. Plaintiff incorporates by reference, as if fully stated verbatim herein, the entire contents of paragraphs 1-210 above.

### The RICO Enterprise

212. For this count, Google is the RICO enterprise, a separate entity which functions legitimately as an internet search engine, and has been corrupted by the RICO conspirators (the publisher of the Geocities website, "Mr. Brown," and the "Voice of Reason"), who use Google to further their RICO conspiracy.

213. The enterprise constitutes a separate entity apart from the racketeering in which it engages. It engages in the legitimate activity of internet publishing and internet searching. The structure of the RICO enterprise is that of Google and the two RICO enterprises outlined in Parker v. LTSC (see Exhibit B).

214. The pattern of racketeering activity alleged herein began on February 27, 2003, when Google was first notified that its enterprise was being used to further the RICO conspiracies alleged in Parker v. LTSC. The two related/underlying RICO enterprises were formed on July 24, 2001, when Wintermute first attempted to enforce the ASF FAQ against Plaintiff, and on December 30, 2001, when the RayFAQ was first published in its new form.

215. The purpose of the RICO enterprise is to obtain property from Plaintiff in the form of customers and market share, and to convert that property into revenue for his competitors, which include Google and their sponsors (some of whom also advertise with Plaintiff).

216. Plaintiff avers that the pattern of racketeering activity is a) currently ongoing and open ended; b) has continued for a period longer than twelve (12) months, and c) threatens to continue indefinitely if not enjoined by this Court.

217. Plaintiff further avers that all similarly individuals are the victims of conspiracies for which Google is the RICO enterprise, specifically those individuals who have been targeted through the use of or reliance on "Googling" them or their business or works.[35]

218. The predicate acts (and other overt acts in furtherance of the conspiracy) have the same or similar purposes (injuring Plaintiff's business and property), results, participants, and methods of commission.

---

[35] As a pro se litigant, Plaintiff cannot lead a class action, but would have filed this case as one if he had an attorney.

## Summary Of Google's Association, Involvement And
## Participation In The Pattern Of Racketeering Activity

219. Google has derived and invested proceeds from the racketeering activity (from the resulting traffic to its search engine) into interstate commerce, in violation of 18 USC §1962(a), and Plaintiff states his claim for relief in this count on that basis.

220. Google's investment of these proceeds into interstate commerce (e-commerce) have caused to further injure Plaintiff in the manners averred herein through Google's obtaining property from Plaintiff in the form of advertising revenue and market share.

221. "Mr. Brown" furthered the RICO enterprise by violating the Sarbanes-Oxley Act (18 USC §1513(e)) by attempting, with full awareness that Plaintiff had been threatened in violation of federal law and reported such threats to law enforcement, to interfere with Plaintiff's employment and livelihood in retaliation for his having reported the federal crime of terroristic threats over the internet against Wintermute (as detailed in the RayFAQ and in Parker v. LTSC, as incorporated by reference herein). Publication of the RayFAQ also violates 18 USC §1513(b) *et seq.* in that its purpose is to intimidate Plaintiff, whom the actor knew was a federal litigant and who had reported federal crimes to law enforcement, for the purpose of hindering and in retaliation for prosecution of a federal civil action. It is therefore a predicate RICO act, and a violation of 18 USC §1962(c).

222. Mr. Brown's (not a party) conduct as averred also constitutes a violation of the Hobbs Act because it is an attempt to enforce the ASF FAQ and obtain property for Google and LTSC through the use of fear, intimidation, and coercion against Plaintiff. It is therefore a predicate RICO act, and a violation of 18 USC §1962(c).

223. Plaintiff incorporates by reference and sets forth, as if fully stated verbatim herein, all of the RICO allegations in Exhibit B (the amended complaint in Parker v. LTSC).

224. Google's republication of the predicate acts hereinabove (the threats and Hobbs Act violations, as well as the Sarbanes-Oxley violations and violations of 18 USC §1513(b)), and its decision not to disable its archive or remove the messages even after being put on notice by the service of the original complaint in this action, constitute separate predicate acts establishing its participation in the RICO enterprise and in furtherance of same in violation of 18 USC §1962(c).

225. Alternative to paragraph 224 above, Google's conduct as averred herein constitutes aiding and abetting of the RICO enterprise in violation of 18 USC §1962(d), because it a) knew of the existence of the enterprise; b) performed acts in furtherance of the conspiracy; and c) those acts (copyright infringement, invasion of privacy, and defamation, among others) are themselves actionable under Pennsylvania or federal law.

226. Other participants in the RICO enterprise are individuals not named in this action who have committed predicate and nonpredicate acts in furtherance of the conspiracy, including but not limited to those individuals named here in the course of presenting evidence of the predicate acts.

## Injury To Plaintiff's Business And Property

227. As a substantial, direct, and proximate result of the conduct of the RICO enterprise, Plaintiff has suffered irreparable pecuniary damage to his business, Snodgrass Publishing Group. Through its wanton, willful and deliberate conduct, the RICO enterprise and its individual members have caused Plaintiff to lose e-book sales, advertising revenue, and affiliate revenue related to his website, thus obtaining property from Plaintiff in the form of revenue and market share.

228. Because of the violations of 18 USC §1962(a-d) set forth hereinabove, Plaintiff is entitled, under 18 USC §1964(c), to recover trebled compensatory damages in an amount to be determined at trial, plus interest and states this claim for relief on this basis.

229. Plaintiff is further entitled to punitive damages in an amount to be determined at trial.

230. Plaintiff is entitled to costs of suit.

231. Plaintiff is entitled to injunctive relief sufficient to terminate the enterprise, and such other and further relief as this Court may deem proper.

## COUNT VIII: RACKETEERING  (SEDUCTION COMMUNITY)

232. Plaintiff incorporates by reference, as if fully stated verbatim herein, the entire contents of paragraphs 1-231 above.

### The RICO Enterprise

233. For this count, the RICO enterprise is the association-in-fact enterprise of the seduction community, as set forth in Parker v. LTSC (see Exhibit B, ¶¶ 234, p. 61).

234. The enterprise constitutes a separate entity apart from the pattern of racketeering in which it engages.  It engages in the legitimate and unrelated activity of internet publishing in general (to USENET or websites), and of giving free or "premium" (paid) advice and information to internet users related to the topics of hypnosis, seduction, and sports betting.

235. The structure of the enterprise is a hierarchy: its "negative" leader is the publisher of the RayFAQ website, while its "positive" leader is LTSC (comprising its users and Defendant Formhandle).  Its "foot soldiers" are those other named defendants who provide links to RayFAQ on USENET, those defendants who otherwise threaten, harass, or defame Plaintiff, and those defendants who have committed other predicate and nonpredicate acts in furtherance of and conspiracy to further the enterprise.

236. The enterprise, through the RayFAQ, USENET postings, and private communications via internet and offline, uses and recruits numerous third parties for the purpose of continuing its pattern of racketeering activity.

237. The enterprise has committed the predicate and nonpredicate acts previously set forth herein, in furtherance of the RICO enterprise.

238. The common purpose of the enterprise is to a) cause injury to Plaintiff's business and other property through threats to his person, his resources, his protected computer, and through the commission of other overt acts in furtherance of the conspiracy; b) through a pattern of racketeering activity; c) in furtherance of the enterprise; and d) to increase market share for others who provide advice and information to the internet in general, and to Plaintiff's target audience in particular.

239. The enterprise is engaged in and affects interstate and foreign commerce.

## Pattern Of Unlawful Racketeering Activity

240. The pattern of racketeering for this enterprise through February 27, 2004 was set forth in Exhibit B to this pleading (the amended complaint in Parker v. LTSC).

241. All of the predicate acts of racketeering activity outlined in Parker v. LTSC and herein are part of the nexus of affairs, functions, and operation of the RICO enterprise.

242. Plaintiff avers that the pattern of racketeering activity for this count began on July 24, 2001, with the "Disclaimer" posting by Doe #1 in Parker v. LTSC (a precursor to the current RayFAQ), and that its current operations are primarily related to the RayFAQ website. Alternatively, it began on December 30, 2001, with publication of the RayFAQ website.

243. Plaintiff avers that the two primary purposes of the RICO enterprise are to a) destroy Plaintiff's business, Snodgrass Publishing Group; and b) increase revenue for Defendant LTSC's website and related business ventures, as well as Google and any other business which competes against Plaintiff's.

244. Plaintiff avers that the pattern of racketeering activity is a) currently ongoing and open ended; b) has continued for a period longer than twelve (12) months, and c) threatens to continue indefinitely if not enjoined by this Court.

245. The purpose of the "seduction community" RICO enterprise is to establish ASF as its personal internet "headquarters," through publication of the ASF FAQ, and through the attempts to enforce that FAQ as outlined herein.

246. Plaintiff avers that the predicate acts averred herein, including those listed in both this complaint and in Parker v. LTSC, constitute separate violations of the Hobbs Act, specifically an attempt to enforce the ASF FAQ through fear, coercion, and intimidation, for the benefit of LTSC, Google, and any of Plaintiff's business competitors.

247. Google's republication of the predicate acts hereinabove (the threats and Hobbs Act violations, as well as the Sarbanes-Oxley violations and violations of 18 USC §1513(b)), and its decision not to disable its archive or remove the messages even after being put on notice by the service of the original complaint in this action, constitute separate predicate acts establishing its participation in the RICO enterprise and in furtherance of same in violation of 18 USC §1962(c).

248. Alternative to paragraph 247 above, Google's conduct as averred herein constitutes aiding and abetting of the RICO enterprise in violation of 18 USC §1962(d), because it a) knew of the existence of the enterprise; b) performed acts in furtherance of the conspiracy; and c) those acts (copyright infringement, invasion of privacy, and defamation, among others) are themselves actionable under Pennsylvania or federal law.

249. Other participants in the RICO enterprise are individuals not named in this action who have committed predicate and nonpredicate acts in furtherance of the conspiracy, including but not limited to those individuals named here in the course of presenting evidence of the predicate acts.

## Injury To Plaintiff's Business And Property

250. As a substantial, direct, and proximate result of the conduct of the RICO enterprise, Plaintiff has suffered irreparable pecuniary damage to his business, Snodgrass Publishing Group. Through its wanton, willful and deliberate conduct, the RICO enterprise and its individual members have caused Plaintiff to lose e-book sales, advertising revenue, and affiliate revenue related to his website, thus obtaining property from Plaintiff in the form of revenue and market share.

251. Because of the violations of 18 USC §1962(a-d) set forth hereinabove, Plaintiff is entitled, under 18 USC §1964(c), to recover trebled compensatory damages in an amount to be determined at trial, plus interest, and states this claim for relief on this basis.

252. Plaintiff is further entitled to punitive damages in an amount to be determined at trial.

253. Plaintiff is entitled to costs of suit.

254. Plaintiff is entitled to injunctive relief sufficient to terminate the enterprise, and such other and further relief as this Court may deem proper.

## COUNT IX: RACKETEERING (LTSC)

255. Plaintiff incorporates by reference, as if fully stated verbatim herein, the entire contents of paragraphs 1-254 above.

## The RICO Enterprise

256. For this count, the RICO enterprise is Learn The Skills Corporation (LTSC), as set forth in Parker v. LTSC (see Exhibit B, ¶¶ 269, p. 69).

257. The enterprise constitutes a separate entity apart from the pattern of racketeering in which it engages. It engages in the legitimate and unrelated activity of internet publishing in general (to USENET or websites), and of giving free or "premium" (paid) advice and information to internet users related to the topic of seduction.

258. The structure of the enterprise was set forth in Parker v. LTSC. The enterprise, through the RayFAQ, USENET postings attempting to enforce the ASF FAQ and LTSC website, and private communications via internet and offline, uses and recruits numerous third parties for the purpose of continuing its pattern of racketeering activity.

259. The enterprise has committed the predicate and nonpredicate acts previously set forth herein, in furtherance of the RICO enterprise.

260. The common purpose of the enterprise is to a) cause injury to Plaintiff's business and other property through threats to his person, his resources, his protected computer, and through the commission of other overt acts in furtherance of the conspiracy; b) through a pattern of racketeering activity; c) in furtherance of the enterprise; and d) to increase market share for others who provide advice and information to the internet in general, and to Plaintiff's target audience in particular.

261. The enterprise is engaged in and affects interstate and foreign commerce.

262. Google's association with and participation in this enterprise consist of knowingly and intentionally providing the use of its website and internet archives for the purpose of exacerbating the harm caused to Plaintiff by the predicate acts averred herein. Other participants in the enterprise not named in this action were outlined in Parker v. LTSC. Still other participants remain unknown to Plaintiff, or were not specified in that complaint.

## Pattern Of Unlawful Racketeering Activity

263. Plaintiff avers that the pattern of racketeering activity began on or about July 24, 2001.

264. All of the predicate acts of racketeering activity outlined in Parker v. LTSC and herein are part of the nexus of affairs, functions, and operation of the RICO enterprise.

265. Plaintiff avers that the pattern of racketeering activity for this count began on July 24, 2001, with the "Disclaimer" posting by Doe #1 in Parker v. LTSC.

266. Plaintiff avers that the two primary purposes of the RICO enterprise are to a) destroy Plaintiff's business, Snodgrass Publishing Group; and b) increase revenue for Defendant LTSC's website and related business ventures, as well as Google and any other business which competes against Plaintiff's, thus obtaining property from Plaintiff in the form of revenue and market share.

267. Plaintiff avers that the pattern of racketeering activity is a) currently ongoing and open ended; b) has continued for a period longer than twelve (12) months, and c) threatens to continue indefinitely if not enjoined by this Court.

268. The purpose of the "LTSC" RICO enterprise is to establish ASF as its personal internet "headquarters," through publication of the ASF FAQ, and through the attempts to enforce that FAQ as outlined herein.

269. Plaintiff avers that the predicate acts averred herein, including those listed in both this complaint and in Parker v. LTSC, constitute separate violations of the Hobbs Act, specifically an attempt to enforce the ASF FAQ through fear, coercion, and intimidation, for the benefit of LTSC, Google, and any of Plaintiff's business competitors.

270. Google's republication of the predicate acts hereinabove (the threats and Hobbs Act violations, as well as the Sarbanes-Oxley violations and violations of 18 USC §1513(b)), and its decision not to disable its archive or remove the messages even after being put on notice by the service of the original complaint in this action, constitute separate predicate acts establishing its participation in the RICO enterprise and in furtherance of same in violation of 18 USC §1962(c).

271. Alternative to paragraph 270 above, Google's conduct as averred herein constitutes aiding and abetting of the RICO enterprise in violation of 18 USC §1962(d), because it a) knew of the existence of the enterprise; b) performed acts in furtherance of the conspiracy; and c) those

acts (copyright infringement, invasion of privacy, and defamation, among others) are themselves actionable under Pennsylvania or federal law.

272. Other participants in the RICO enterprise are individuals not named in this action who have committed predicate and nonpredicate acts in furtherance of the conspiracy, including but not limited to those individuals named here in the course of presenting evidence of the predicate acts.

## Injury To Plaintiff's Business And Property

273. As a substantial, direct, and proximate result of the conduct of the RICO enterprise, Plaintiff has suffered irreparable pecuniary damage to his business, Snodgrass Publishing Group. Through its wanton, willful and deliberate conduct, the RICO enterprise and its individual members have caused Plaintiff to lose e-book sales, advertising revenue, and affiliate revenue related to his website, thus obtaining property from Plaintiff in the form of revenue and market share.

274. Because of the violations of 18 USC §1962(a-d) set forth hereinabove, Plaintiff is entitled, under 18 USC §1964(c), to recover trebled compensatory damages in an amount to be determined at trial, plus interest, and states this claim for relief on this basis.

275. Plaintiff is further entitled to punitive damages in an amount to be determined at trial.

276. Plaintiff is entitled to costs of suit.

277. Plaintiff is entitled to injunctive relief sufficient to terminate the enterprise, and such other and further relief as this Court may deem proper.

## COUNT X: ABUSE OF PROCESS

278. Plaintiff incorporates by reference, as if fully stated verbatim herein, the entire contents of paragraphs 1-277 above.

279. In its Motion To Dismiss, Google made the unsupported and fabricated averment that Plaintiff has a "history of vexatious litigation." Plaintiff has addressed the specifics of that motion in his responsive pleading thereto.[36]

280. No court has ever held that Plaintiff is a vexatious litigant. Indeed, the only cases Plaintiff has brought in any state or federal court since November 2000 were either settled in his favor (including Parker v. Dryer and a case against a Philadelphia employment agency that was settled in 2002), or if dismissed, have been refiled (such as Parker v. LTSC replacing Parker v. Wintermute) or have an appeal pending (such as Parker v. University of Pennsylvania or Parker v. Tilles et al.).

281. Google's statements in its Motion To Dismiss were made not for the purpose of moving to dismiss Plaintiff's complaint, or for any legitimate purpose relating to this action, but instead for the improper purposes of furthering the RICO enterprises averred herein, defaming Plaintiff, and inciting third parties into trivializing his claims in this case in particular, and in other cases in general, including but not limited to the Defendants in Parker v. LTSC.

282. As a direct and proximate result of Google's conduct as averred herein, Plaintiff has suffered harm in the form of harassment (including death threats such as those by Mr. Braithwaite as averred herein), scorn, contempt, ridicule, and increased legal costs resulting from others showing less respect for his rights than they otherwise would, lost revenue and sales for his business, and the loss of actual or potential employment or business relationships from which he would otherwise thrive and profit.

283. Plaintiff is entitled to relief under the Pennsylvania common law tort of abuse of process, and states his claim for relief for this count on that basis.

---

[36] The Motion To Dismiss and Plaintiff's responsive pleading, filed concurrently with this Amended Complaint, are incorporated by reference as if fully set forth verbatim herein.

284. Plaintiff is entitled to compensatory damages for harm to his reputation, increased legal exposure and cost, loss of revenue, loss of reputation, loss of opportunity in business and employment, and for loss of enjoyment of life, in an amount to be determined at trial.

285. Plaintiff is further entitled to the maximum punitive damages allowed under the law.

286. Plaintiff is entitled to costs of suit, injunctive relief sufficient to terminate the actionable conduct, and such other and further relief as this Court shall deem just and proper.

## COUNT XI: CIVIL CONSPIRACY

287. Plaintiff incorporates by reference, as if fully stated verbatim herein, the entire contents of paragraphs 1-286 above.

288. For the same reasons which support the RICO claims as averred herein (Google's participation in the RICO enterprises), but against the lower standard of requiring only two actors to conspire to violate any Pennsylvania law which can give rise to a civil action, Plaintiff is entitled to relief under the common law tort of civil conspiracy, and states his claim for relief in this count on that basis.

289. Plaintiff is entitled to compensatory damages for harm to his reputation, increased legal exposure and cost, loss of revenue, loss of reputation, loss of opportunity in business and employment, and for loss of enjoyment of life, in an amount to be determined at trial.

290. Plaintiff is further entitled to the maximum punitive damages allowed under the law.

291. Plaintiff is entitled to costs of suit, injunctive relief sufficient to terminate the actionable conduct, and such other and further relief as this Court shall deem just and proper.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for the following relief:

1. For all counts, or any combination of counts among all the counts, unspecified compensatory damages in an amount to be proven at trial, trebled for any RICO violations, and which is not less than TEN BILLION DOLLARS ($10,000,00.00 US)

2. For each count where applicable, the maximum punitive damages allowed by law.

3. Injunctive relief prohibiting Google from archiving future defamation against Plaintiff or his business.

4. Injunctive relief prohibiting Google from continuing it's "opt out" copyright policy, and requiring it to obtain express permission of the copyright holder prior to including any website in its cache or search results.[37]

5. Injunctive relief prohibiting Google from returning any search results from its web or USENET archives for the terms "Gordon Roy Parker," "Gordon Parker," or "Snodgrass Publishing Group."

6. Injunctive relief requiring Google to remove any postings in its archives for which it has been notified by Plaintiff that the posting is either defamatory or an infringement of his copyright or which violates any of his legal rights as set forth in any notice.

7. Costs of suit, including any reasonable attorney fees.

8. Such other and further injunctive relief sufficient to terminate the actionable conduct, and any other relief which this Court shall deem just and proper.

---

[37] Google's search results are culled from the copies of the websites copied into its index without permission, and are quoted within the results. Allowing this business model to continue will prevent the development of human-edited directories that do not offer the "garbage" collected by Google's web and USENET "spider" bots.

## JURY TRIAL DEMANDED

Plaintiff demands trial by jury in this matter.

This the 22nd day of October, 2004.

                                        _Gordon Roy Parker_
                                        Gordon Roy Parker
                                        4247 Locust Street, #806
                                        Philadelphia, PA  19104
                                        (215) 386-7366
                                        E-mail: SnodgrassPublish@aol.com
                                        Plaintiff, Pro Se

## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **GORDON ROY PARKER,**<br><br><div align="right">Plaintiff</div><br><br>v.<br><br>**GOOGLE, INC.,** and John Does #1-50,000,<br><br><div align="right">Defendants</div> | **CASE NO.:** 04-cv-3918<br><br>**Judge: James McGirr Kelly** |

### VERIFICATION

I, Gordon Roy Parker, Plaintiff, domiciled at 4247 Locust Street, Philadelphia, Pennsylvania, hereby attest, under penalty of perjury, that all statements of fact contained within the foregoing **AMENDED COMPLAINT AGAINST GOOGLE, INC.** are true to the best of my knowledge.

This the 22nd day of October, 2004.

Gordon Roy Parker
4247 Locust Street, #806
Philadelphia, PA  19104
(215) 386-7366
E-mail: SnodgrassPublish@aol.com
Plaintiff, Pro Se

# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **GORDON ROY PARKER,** <br><br> Plaintiff <br><br><br> v. <br><br><br> **GOOGLE, INC.,** and John Does #1-50,000, <br><br> Defendants | **CASE NO.:** 04-cv-3918 <br><br> **Judge: James McGirr Kelly** |

## CERTIFICATE OF SERVICE

I, Gordon Roy Parker, Plaintiff, domiciled at 4247 Locust Street, Philadelphia, Pennsylvania, hereby certify that I have served a copy of the foregoing **AMENDED COMPLAINT AGAINST GOOGLE, INC.** on Defendant's counsel through its attorney of record, by **regular mail,** to the following addresses:

John E. Riley, Esq.
Vaira & Riley, P.C.
1600 Market Street, Suite 2650
Philadelphia, PA  19103

Leo P. Cunningham et al., Esq.
Wilson Sonsini Goodrich & Rosati P.C.
650 Page Mill Road
Palo Alto, CA  94304

This the 22nd day of October, 2004.

FILED

OCT 22 2004

MICHAEL E. KUNZ, Clerk
By_____Dep. Clerk

Gordon Roy Parker
4247 Locust Street, #806
Philadelphia, PA  19104
(215) 386-7366
E-mail: SnodgrassPublish@aol.com
Plaintiff, Pro Se

2